Our next appeal is 17-2465, In Re Marco Guldenaar Holding. We ask that this Court reverse the Patent Office's decision, the Board's decision, affirming the examiner's rejections under both Section 101 and Section 103. We'll take each rejection in turn, and I'll start with the Section 101 rejections. The claims here are directed to a method of providing a new dice game using a new specifically claimed arrangement of die, at least three die. For this reason, we think that the claims pass under the first prong of the Alice test. However, I'd like to start with prong two, for the reason that we believe that prong two is probative of other issues that arise in the Section 103 context, notably the printed matter issues. And we believe that prong two is just the simpler ground to decide the Alice issue on. Now, we believe that the In Re Smith case from 2016, this Court's decision in In Re Smith, controls. And the facts in that case were a method of playing a card game using a standard 52 deck of cards. And what Judge Stoll found in that case, in that decision, was that although those claims were directed to an abstract idea of playing card games, and although they were ineligible under prong two for being conventional, that the outcome would potentially differ if a non-standard, non-conventional deck of 52 cards was used. And that's exactly what we have here. The PTO agrees that if the, in their brief, if the limitations on the die are given weight, that they do differ from conventional, six-sided, numerical one through six dice. So we believe that In Re Smith, in that context, controls a second prong of Alice, unconventional die. That was just speculation, though. That was not the holding of the case. That's correct, Your Honor. But it doesn't control. True, Your Honor. And I apologize for saying it controlled. It's dicta. It's dicta. But we believe that it's a very persuasive opinion in In Re Smith. And in fact, the Patent Office actually agreed during oral argument that the prong two analysis would be informed with a non-conventional, non-standard deck of cards. Would your position be different if the patent were directed to a set of three six-sided dice in which the numbers, the dots on the dice were exactly the same as the dots in the present typical die, but the rules of the game were that betting would apply to the number six on one of the dice, the numbers six and five on the second of the dice, and the numbers six, five, and four on the third of the dice? In that scenario, Your Honor, Judge Bryson, I believe that would be invalid because the claims, the dice themselves, would be conventional die. And the invention in that case would be directed to the rules of playing the game, the mental steps that are being performed by the dealer or the player in that instance to determine what those die, the conventional die, meant in the rules of that context. And here we have the stark difference in our claims is that the claims have a first die having a first die marking on only one side. And the claims say only, and that was an amendment made during the prosecution to specifically overcome the comparison to standard die. The second dice has a second die marking on only two sides, and the third die has a third die marking on only three sides. And so we believe that that language was, it specifically differentiates from standard die, and under prong two of Alice, the invention lies in part in the arrangement of the indicia and the provision of those dice. So I do believe that it differs in that particular scenario, Your Honor. So your inventive concept, I guess, in these claims is the markings or lack of markings on the face of the individual die? Judge Chen, I believe that the inventive concept here is a combination of the non-conventional dice in addition to the method of playing the game. And if you look at the steps of playing the rolling and the wagering steps, they do differ from the claims. Claim one is the broadest claim. The steps of the method interrelate the die markings. They use the die markings to play the game. So to answer your question directly. By getting back to your earlier colloquy with Judge Bryson, it sounded like those kinds of interactions in playing the game, in your words, would be mental steps that therefore don't really get much weight in the whole inventive concept inquiry, I would think. You're right, Your Honor. The difference is that in the hypothetical that Judge Bryson gave me, some of the rules were to compare standard sets of dice faces to a set of rules that would apply in this game. And those were the mental steps that I was talking about. In In Re Smith, in fact, several of the claim method steps involve mental steps to be performed by the dealer, of determining if so and so happens in this game. And these claims actually all start with active gerunds, steps, physical steps, rolling, wagering, paying. So there are physical steps that are being claimed. And we think that in combination, if you look at step two of Alice, and combining those steps with the provision of the non-conventional die, it does satisfy prong two of Alice. And it is eligible for that reason. My concern, or I guess, which was the board's concern, is that your inventive concept hinges on printed matter. And then there's the printed matter doctrine, which has its origins, in fact, in section 101. And so what are we to do when, if we were to conclude there's an abstract idea here, the abstract idea of wagering, playing a game, and then the steps of rolling dice and paying out for a win are conventional steps. But then the inventive concept hinges on the information that's communicated to the players based on which side of the individual die faces upwards. And that would be, that runs seemingly right into the printed matter doctrine, where this court is held, and predecessor courts have held, that printed matter, these types of markings on the surface of objects, is not accorded any patentable weight. And in isolation, if that's all there is, that is not eligible subject matter. So what's your response to that apparent challenge to these claims? I agree, Judge Shen, that the printed matter doctrine is informative of section 101. In fact, the examiner and the board did not explicitly provide or apply printed matter to the 101 rejections, but we do agree that if the limitations aren't given weight, then pronged-to analysis has to fail. So I do agree with you, Judge Shen. We do believe the printed matter doctrine just does not apply here because we're not claiming the die markings for the informational content. It's the arrangement of the die markings on the die. So the printed matter test has two steps, as this court laid out in Reda Stefano. The first step is very simple. Is this printed matter? Is this being claimed for the content or the informational content that's being conveyed? And we can answer that question in the negative here. Because the claims actually specify die markings. The specification makes clear that those markings could be a logo or any sort of indicia. The arrangement is what's important here. So in the printed matter test, I think that we can satisfy both prongs. We satisfy the first prong by just simply not being printed matter and not being directed to informational content. Very similar to the web assets in Reda Stefano, which weren't given patentable weight by the Patent Office, but this court did, because the origins of those web assets were not informational content. It was where they came from. And very similar in this case, the arrangement of the die markings are not informational content. It's where they're arranged on a die. Now moving to the prong two, we think that prong one is the clearest way to decide the printed matter issue. But moving to prong two, whether they're structurally or functionally related to the die, the answer is absolutely. What we have here is very similar to the In Re Gulak facts, in where the indicia, the markings, exploit the multi-sided nature of the die and exploit the multiplicity of the die. In Re Gulak, the printed matter was digits. It was specific digits that met an equation. And the substrate, the specimen, was a band, a circular band. And what this court found is although the claim specified the informational content, that the claims themselves were directed to a functional relationship between the information, the endless sequence of digits, and the endless continuous nature of a circle, of a band. And therefore, the digits were given weight. And we think that's exactly the case here. A die is not a piece of paper. It's a multi-sided object. And the fact that we have one dice with a die marking on only one side, a second dice with a die marking on only two sides, and the same for the third die marking, shows that the claims, the inventor, have actually exploited the multiplicity and multi-sided nature of the dice. Not only three dice, but dice with at least, in this case, four sides, or it could be six sides, depending on the claims that you look at. So we do believe that printed matter is just not an issue. And again, the Patent Office didn't explicitly apply it to Section 101. I agree that it is informative. It's just not an issue for us. And when we get to moving down to the Section 103 issues, the obviousness issue, that's all there is in the record. The Patent Office and the Board wholly relied on printed matter. There's no evidence that these claims are obvious. Let me ask you a question about the relationship between the 103 and 101 arguments. If we were to agree with you on 101, but agree with the Board on 103, I take it that that would leave several claims unrejected. Is that correct? So 103, standing by itself, will not dispose of this case. Is that correct? That's correct, Your Honor. The Board did find that claims 2, 10, 18, 24, 25, and 26 were not rejected with substantial evidence at the examination level. So the Board did open that up. As far as the interrelation between those. Those are still in play, in other words. You haven't abandoned those claims. Correct. It wasn't entirely clear to me from the briefs what the status of those claims is. But you've clarified it. Thank you. Correct, Your Honor. To the extent that the Board finds the dice to be unconventional, then there's no evidence that shows that they're obvious. I do think that while these inquiries are separate, and they must be separate, is that what we have here for claims 2, 10, 18, 24, 25, and 26 is an admission that there's no evidence to show obviousness. Without that evidence, we don't see how it can be possibly conventional under Section 101. There's only one prior reference that's cited. That's the Carroll reference. Carroll talks about numerical dice, number 1 through 6. That is all it teaches. There's no teaching suggestion or motivation in Carroll to lead one skilled in the art to make these very specifically arranged die, to arrange this die in the context of the game. We believe that there's no motivation because Carroll wouldn't work with that. If you look at Carroll, there's betting fields where users bet on numbers 1 through 6. What number is going to turn up when you roll these dice? If you have that, that's the betting fields in Carroll, that wouldn't work with these die. There's really no interrelation between this. The Patent Office has one point on obviousness aside from printed matter. It's that it would be an obvious rearrangement of indicia. There's no evidence to that. There's absolutely no evidence or reasoning of why that would be. KSR is cited just generically, and In Re Saeed is cited for the premise that arrangement of indicia would be obvious per se. In Re Saeed dealt with whether or not a figure that was identified by the applicant was indeed recited in the claims. It was a matter of whether or not the limitations were claimed, not so much, as the Patent Office says, of an obvious rearrangement of indicia. We don't believe that there's evidence there to make that connection between the Section 103 rejections and the 101. You're into your rebuttal. Do you want to say you're into your time? Thank you, Your Honor. Please, Scott. All right. Let's hear from the Patent Office. Ms. Kelly? Good morning, Your Honors. May it please the Court. Mr. Goldenear's dice are simply not inventive enough to transform the claim gambling method into something that's patent eligible, and even if it were, his claims are obvious. But again, we can't decide this case on obviousness grounds alone. I take it you don't disagree with him on that. Oops. Sounds like maybe you do. I agree that the board said the examiner hadn't provided enough evidence that dice tumblers and dice cups are well known. From where we are at this point, some claims would remain if we decided this case only on 103, if we, for example, reversed on 101, and therefore, 103 doesn't carry the day for you. Correct? Correct. It doesn't carry the day for me. All right. Although I would submit that the examiner could easily find those references. Should you remand, the examiner could easily find references to establish that dice cups and tumblers are old and well known. It doesn't matter for this appeal. But that opportunity has passed, right? These claims would issue, I take it, if we were to say the claims that were struck down on 103 are affirmed, but the remaining claims have not been adjudicated against the applicant, and therefore, they would issue, would they not? The claims that are on appeal before you are the claims that the board rejected. Right. But the claims that were not rejected, I take it, are open to issuance if we should reverse on 101. Isn't that correct? They're open to issuance. It doesn't mean that they will, in fact, issue. Okay. I'm not sure I exactly understand what the process, what you mean, you think that the examiner would get another shot? I don't believe that they're appealing that part of the opinion. No, no, they won that part. So, they won the various claims. So, I don't see that there's a process, maybe there is, that I'm not aware of, that the examiner would get another shot at this. I understand your point. Now, I understand what you're saying. Your point is that the examiner has the discretion to reopen prosecution and perhaps do another prior art search and find more prior art. I think that would be the case. Let me finish. Let me finish. So, he went down in the first instance because apparently he didn't find these particular claim elements. And so, the agency has the discretion to reopen prosecution. Is that the point you're making? The point I'm making is that they wouldn't be allowed to reopen prosecution on this particular reference, just the Carroll alone, but they could on a new combination, Carroll and other I understand that. I'm sorry, I wasn't clear. I think I'm satisfied that I got the answer. I did want to address two points raised by my friend across the aisle. The first is when you look at the Gulach and Miller cases, the difference in those cases was that it really mattered what the markings were and it really mattered where they were on physical objects supporting them. Here, that's not the case. In Gulach, you had a measuring cup. Now, you could put the markings on that measuring cup. The measuring cup allowed you to double and half recipes and triple and so on. You could put the markings on the cup so that they faced the user or away from the user or often to the side. But, they still had to designate specific volumes on the cup. So, they needed to be placed on the cup at specific levels. And they needed to contain specific words. Maybe they might use the metric system and maybe they might use the English system. But, they needed to provide certain information. In the case of the wristband, you couldn't change what those numbers were. You couldn't change their location. Otherwise, that wristband wouldn't function. In this case, the die markings, and they admit the die markings could be anything. The die markings only tell you whether it's a winning face or not. And, the die markings can appear anywhere on the dice. The only thing is you need to know how many faces on the dice the marking or markings appear. Because that allows you to calculate the probabilities of winning. That's pure printed matter. And, that's something that conventional dice do. Which shows that these, this method... I guess the other side is saying, well, they regard this as a structural relationship between the indicia and the structure of the die. Because, in these instances, you're either increasing or decreasing the chances of winning based on the number of sides you put any kind of printed matter on. And so, to that extent, by limiting the number of sides you put a marking on, you've designed the success rate into the game. Well, that argument fails for the same reason provided in Judge Bryson's hypothetical. Because you don't need to change the dice to change the probabilities of winning. You could just say on the first die, if you get a six, that's the winning face. And, you win on that die. On the second die, you could get a six or a five. And, your probability is now one in three. You know, on the last die, you could say winning sides are four, five, and six. And, then your probability of winning is one in two. So, it doesn't change the probability. I mean, there's nothing about it that changes the probability. You could still perform this exact method with the conventional dice. And, that's the method of Carroll. What do you have to say about the Smith case that he put so much weight on? What I would say about the Smith case is what you correctly pointed out, which that was dicta in Smith. The court didn't say that a new set of cards would make the invention at issue in that case patent eligible. It merely said we could envision that there might, you know, someone might come up with a set of cards that was so inventive where that would occur. But, the court didn't say that just having a new deck of cards would be enough to get you over the second step of Alice. Well, maybe this example, which is, I think, taken from one of the board's cases, you might be able to help me on this. The board case, I think, involved a chess game that added a piece, actually two pieces, which I think were called esquires. So, they moved in a way different from the knights, bishops, rooks, kings, and queens and pawns. All right, so, with a 10 by 10 board. And, they said, yeah, that's, I guess that was permitted, was issued. But, if you just changed the traditional black and white colors to red and blue, then I guess you'd say that isn't enough to constitute a new game as long as the moves of the parties were still the same. Correct, Your Honor. In fact, my son has a green and brown chess board at home. And so, that is a conventional chess board. It does nothing more than what chess boards or checkerboards have done. Would you agree with the extra piece being patentable? Post Alice? I think that's a tough question. Alice doesn't really fit very well to this category of cases, does it? Candidly. Well, I mean, no one case fits all fact patterns. But, I don't think that there are any cases that would support what we have here. I mean, if you looked at a case like Mayo, what we have here is, essentially, like in Mayo, where you're really talking about some combination of mental steps and some instructions about how you correlate instructions about how to dose certain medication based on lab results. And so, here, you're just saying, okay, well, here's how you parlay this bet throughout this method. You're simply saying, you know, we are going to parlay a bet across three sets of die, which is all conventional. You're going to identify winning faces. The probabilities of you getting a winning die face will increase as you roll each of the three die. It's, you know, and my saying that, I just, when I'm giving that example now, I'm realizing that one of the things that Appellate has argued in his brief is that, you know, Mayo talks about a preemptive effect and this wouldn't have a preemptive effect. No, but that isn't dispositive. That doesn't control what's going on in this case. I'm sorry. Go ahead, please. There's a Games Art Unit at the PTO, right? Yes. And I guess, what are they allowing these days? Do you have any idea? I mean, what kinds of games possess an inventive concept at this point? I don't know per se, but I know that from cases that this court has handled, like the WMS case and things like that, that as far as gaming devices are concerned, those claims issue on gaming devices. But those are all computerized devices, if I recall. We have a lot of those cases, but aren't those all just slot machine type cases with different ways of playing the game where the focus is on the technology? This is an area where there is no technological ingredient. Agreed. In fact, by admission in appellate specification, we're talking about if there is a technology, it's a technology that goes back 5,000 years to the literal rolling of bones here. So this is a different situation. So if our Gaming Arts Unit is still up and running and slot machines are one example of a sort of invention, a gaming device that they would allow to receive. This is a follow-on question. I saw that the examiner first characterized the abstract idea as methods of organizing human activity. Ward made reference to that characterization as well. Do you have an idea of what the agency regards as a method of organizing human activity? What's their understanding of that phrase in terms of how they apply it to hundreds of thousands of applications each year? Obviously not every application gets a 101 rejection, but I'd like to know what you can tell us about how the agency understands that phrase. I'd like to give you both a general and a specific answer. I'll start with the specific answer. The specific answer is rules for playing a game. And that's how this particular invention is viewed. We're just talking about rules for playing a particular game and that was the case in Smith. In a larger sense of the word, methods of organizing human activity certainly wouldn't be restricted to games. It might be rules for a particular dance. Methods of organizing people could be a lot of arrangements. Business arrangements, I guess that's how it's called. Yes, it could be business arrangements. McDonald's has its QVC thing, quality. It tells its employees to interact with customers or certain things when you do, how you greet a customer and so on. All those things, they're not padded. I guess I'm wondering if there's some kind of policy document that's written up that explains, we are the PTO, this is how we understand methods of organizing human activity. One is being prepared. It should issue in the next couple of months. I'm sure you're aware, and I feel that maybe this is what your question is getting to, that Director Iancu issued a statement last Monday stating that, outlining the different types of patent-eligible subject matter and how the agency would view these things moving forward. What's happened in this case is not, that future guidance will not affect this case at all. Even though the guidance is not complete, we have discussed this case with people within the agency who are preparing and reviewing that guidance. I have one more question. I just really find it difficult to apply 101 in this setting, but I understand that it's there and we have to try. But with respect to the rules of games, suppose I go over to the patent office and I say, I have a new game. It looks a lot like Monopoly, but it's updated. I've got, instead of Mr. Moneybags, I have Warren Buffett or whatever, and I have redesigned the various properties. Now, setting aside 103, would my new game be patentable? I have different little characters. I don't have the thimble. I have a spaceship or something like that. Would that be patentable? Probably not. Not the method of playing. Even if I had a Tesla instead of a little car and so forth? So the implements were different? In essence, your implements would be conventional implements. What you've described alone would not be enough to move the method of playing that game into something that's patent eligible. All right. Could I ask you the same question, Mr. Allen? Sure, Your Honor. Would that game, my game, be patentable? I believe so, Your Honor. And in fact, the patent office does issue patents on board games even to this day. Right. And the fact that, what would make the difference? The fact that I put different names on the properties that I added new tokens? Judge Bryson, it would be the new pieces. It would be the kit, essentially, to play the game in combination with the gameplay. The indicia or the markings, you couldn't claim them for what they said, what the price was, what the property was on Monopoly. But overall, with the kit and the pieces, it does... It's a new manufacture? Absolutely. Or a process that uses unconventional means. So we do believe that that would be eligible. And go back to your point on Ex Parte Stavorevic, I believe is the name, the board case from 2013... This is the 10-square, 10-by-10 chess board? Exactly. And that case, Your Honor, is exactly in line with In re Smith, which came out from this court three years later, where it found that if you took a game and changed something about the physical arrangement of the game, that's a new game, and that is unconventional. So we do agree that Ex Parte Stavorevic is indicative of this case. I do want to talk about printed matter really quickly. Judge Bryson, you mentioned that Alice jurisprudence does not fit to this case very well. And I agree with that. To go back to the Stavorevic case, you're not suggesting that if I go over to the PTO and I submit a chess game in which you can't take pawns en passant, that I am entitled to claim that that's a new invention, right? Absolutely not, Your Honor. Setting aside 103, it would be invalid under 101? Yes, that would be a rule. So your invention there, the inventive concept, would be a rule, an abstract idea. And what's left for second prong of Alice in that circumstance would be nothing. There would be nothing left except a conventional chess board with conventional chess pieces. So if I change the knight from being a knight with a horse's head and turn it into an elephant, actually the elephant looks like a rook. So if I change it by putting a peacock in where the knight is, then that would be a change in the pieces that would be sufficient to be patentable? Potentially. I don't think that would be patentable, Your Honor, because the peacock in that instance is still a conventional item. It doesn't really affect the gameplay. But it's a different piece. It's a different... In Ex parte Stavorevic, they added an additional... I understand that. But I'm backing off from Ex parte Stavorevic. I struggle with that hypothetical, Judge Bryson, because I do not think that that would add much. That's not the inventive concept there. You're still playing the game of chess and you're still using the pieces just because one piece changes in appearance. I don't think that would really affect the analysis. I think Ex parte Stavorevic is really interesting because they added the column in row to the chess board which affected the gameplay and affected the article of manufacture. Okay. On the printed matter issue, I think that the Patent Office skipped the first prong of the printed matter test. Went straight to Gulak and Inrei Miller talking about the structural and functional relationship. Like I said before, I don't think we get there. We don't get to the second prong. But if we do, let's look at the second prong. What the Patent Office said was that the die markings convey winning or losing. And that's simply not the case. Winning or losing depends on the wager, depends on how the game is set up. What the die markings convey is just that they exist. And if we reach a point in the printed matter jurisprudence where simply existing is conveying information, we're back to Inrei DiStefano where the web assets existed. It doesn't mean that they convey information. A chair exists and it conveys the fact that it's a chair. And that's exactly the logic that's being applied to the dice in this case. And looking at the... We think that we have on the second prong much more than the claims in Inrei Gulak and Inrei Miller. So Gulak actually dealt with the digits on the circular band. Miller was the volumetric indicia on a container, on a vessel. And that's indicia that's printed on the side of a vessel while it's surely functionally related to the volumetric measurements in that vessel. We have much more in this case. We have a multi-sided die that have a very specific arrangement of indicia. So to the extent that we get past that first prong of printed matter and we actually do look at the structural or functional relationship and I emphasize that it's really not necessary that we clearly have that functional structural relationship more so than Miller, more so than Gulak. And finally, the Patent Office mentioned Smith and to your point, Judge Mayer, the fact that Smith... We're using the negative rule from Smith, the dicta, if you will. In that case, however, the court specifically asked the Patent Office during oral argument if they agreed with that position and the Patent Office agreed. And all we're asking for is that rule to be applied to these set of facts. Thank you so much. Case is submitted.